[No. D006455. Fourth Dist., Div. One. Oct. 31, 1989.]

In re MANUEL P., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MANUEL P., Defendant and Appellant.

## COUNSEL

E. Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Pat Zaharopoulos and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

Edwin L. Miller, Jr., District Attorney (San Diego), Peter C. Lehman and Patricia L. Davis, Deputy District Attorneys, Lloyd M. Harmon, Jr., County Counsel (San Diego), Daniel J. Wallace, Chief Deputy County Counsel, Gary C. Seiser, Deputy County Counsel, De Witt W. Clinton, County Counsel (Los Angeles), and Philip H. Hickok, Deputy County Counsel, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**BENKE, J.**—In this case the San Diego Juvenile Court, pursuant to power provided by Welfare and Institutions Code section 738[1] and procedures developed in cooperation with among other entities the federal government,

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

Section 738 provides in pertinent part: "In a case where the residence of a minor placed on probation under the provisions of Section 725 or of a ward of the juvenile court is out of the state and in another state or foreign country, . . . the court may order such minor sent to his parents, relatives, or guardian, or to the person charged with his custody, *or, if the minor is a resident of a foreign country, to an official of a juvenile court of such foreign country or an agency of such country authorized to accept the minor,* and in such case may order transportation and accommodation furnished, with or without an attendant, as the court deems necessary. If the court deems an attendant necessary, the court may order the probation officer or other suitable person to serve as such attendant. The probation officer shall authorize the necessary expenses of such minor and of the attendant and claims therefor shall be audited, allowed and paid in the same manner as other county claims." (Italics added.)

ordered custody of a juvenile offender transferred to juvenile court officials in Mexico where the youth resides. On appeal we find the statute and procedures do not infringe upon federal prerogatives over immigration and foreign relations or the juvenile's constitutional rights.[2]

## BACKGROUND

### *Manuel P.*

Appellant Manuel P. is an undocumented Mexican national who was first certified to the San Diego Juvenile Court on February 24, 1987, for his part in stealing two bicycles. According to the probation report, Manuel and a companion used the bicycles for transportation and proceeded to burglarize residences. Manuel told the probation department his companion instigated the offenses. He had never before crossed into the United States illegally. Manuel explained that at the time of the offenses he was desperate, hungry and cold. All he wanted was to return home to Mexico. Following admission of one count of burglary, Manuel was declared a ward of the court and ordered not to return to this country illegally. He was then returned to Mexico.

Apparently Manuel, who was 18 years old at the time, remained in Tijuana, Mexico, until April 20, 1987, when a friend invited him to go to Los Angeles and visit the friend's aunt. They had not eaten for a day so while passing through San Diego they entered an unlocked residence and took food from a refrigerator. Manuel was observed by a neighbor and apprehended by police. He was charged in a section 602 petition with violating the terms of his probation in the previous case by entering this country illegally and attempting to burglarize an inhabited residence. At an adjudication hearing held on May 4, 1987, Manuel, represented by counsel, admitted the allegations of the petition. Upon recommendation of the prosecution the juvenile court struck the inhabited dwelling/residence allegations. The probation department again verified Manuel was an undocumented Mexican national whose parents resided in Culiacan, Mexico.

On May 18, 1987, the juvenile court accepted the probation department's recommendation and ordered Manuel continued as a ward of the court

---

[2]The Attorney General initially argues we need not reach the constitutional issues raised by Manuel because the juvenile court no longer has jurisdiction over him, the case is moot and the record is inadequate to permit review. He requests we dismiss the appeal or remand the case for an evidentiary hearing. Because this case involves a question of public interest which is likely to recur yet evade review, we conclude it is appropriate to reach the issues raised by Manuel. (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737], quoting *County of Madera* v. *Gendron* (1963) 59 Cal.2d 798, 804 [31 Cal.Rptr. 302, 382 P.2d 342, 6 A.L.R.3d 555]; *In re Arias* (1986) 42 Cal.3d 667, 673, fn. 1 [230 Cal.Rptr. 505, 725 P.2d 664].)

under section 602. Custody was taken from his parents pursuant to section 726, subdivision (c), and he was ordered placed in a juvenile ranch facility at Campo, California, for a maximum of 240 days. During incarceration, visitation would be permitted with his family and upon completion of the ranch program he was to be returned to Mexico. Following his release to federal Immigration and Naturalization Service (INS) officials, jurisdiction would be terminated.

On June 8, 1987, the probation department requested modification of Manuel's commitment in order that he be placed in the Border Youth Project, a local program by which he would be returned to officials of the juvenile court in Mexico. Following consideration of the request, the San Diego juvenile court vacated Manuel's camp commitment and pursuant to section 738, ordered him returned to officials of the Tijuana, Mexico, juvenile court. Counsel for Manuel expressed his concern that because Manuel was then 18 years old, Mexican officials might imprison him in an adult facility in Mexico which would give him little assistance and might well consign him to an unknown fate.

Nonetheless, the court ordered Manuel returned and recommended he receive "second-level" treatment, a term utilized by Tijuana juvenile authorities to designate placement of the minor at "La Granja," a state operated treatment facility which provides residential and counseling services. "La Granja" is a Mexican analog to the California Youth Honor Camp. The trial court recommended this placement because it was consistent with the court's initial recommendation.

In addition, the May 18, 1987, social study prepared for the San Diego juvenile court was ordered translated into Spanish and delivered to Mexican authorities. A future status update concerning the minor was ordered and the appointment of counsel was ordered to continue until statutory time for application of appeal had passed. All prior orders not in conflict were continued, including the one requiring Manuel be deported through the INS.

Prior to his departure from the United States, pursuant to the juvenile court's order, Manuel was released to federal immigration and naturalization officials. In accordance with guidelines then in effect, the probation department delivered Manuel to the INS together with a packet of information which contained a copy of (1) Manuel's San Diego County Probation Department booking form; (2) an Immigration Detainer—Notice of Action received from the United States Department of Justice concerning appellant; (3) the San Diego juvenile court disposition order dated May 18, 1987; (4) the application for order dated June 8, 1987; (5) the disposition order

dated June 17, 1987; and (6) the probation social study which had been translated into Spanish.

As part of the INS procedure, Manuel was entitled to a formal deportation hearing which, if requested, would have required he be immediately placed in INS custody pending the hearing. Manuel was also entitled to waive the formal deportation hearing, which he did by executing INS Form I-274.[3]

Having waived a formal deportation hearing, Manuel's deportation process was completed and he was delivered to the border where he was turned over to Tijuana juvenile court officials. Manuel was accompanied by a representative of the San Diego juvenile court, Steve Contreras, senior probation officer of the San Diego County Probation Department.[4]

Manuel signed his notice of appeal, June 19, 1987, two days prior to leaving the United States.

On March 6, 1988, a hearing was held to review Manuel's status. At that time the probation department informed the court that Manuel had been released to his parents and had been sent to his legal residence in Mexico. It was noted he would be 19 years of age on April 25, 1988, and there had been no further known contact with United States authorities.[5] Upon recommendation of the probation department, jurisdiction over Manuel was terminated.

Although the San Diego juvenile court and probation department had recommended second-level treatment, i.e., camp placement in Mexico, Manuel received first-level treatment under which he was sent home to his parents.

### The Border Youth Project

Because Manuel has challenged both the statute and local process by which he was returned to Mexican juvenile authorities, we feel it beneficial

---

[3] The form advised Manuel of his right to voluntarily return to his country of origin, to speak to a lawyer, to speak to a representative of the consulate of his country of origin and the right to a deportation hearing. The form carries the date July 21, 1987, an apparent discrepancy which neither party argues affects this case. The parties agree Manuel signed the form prior to leaving the United States.

[4] Section 738 authorizes a representative of the juvenile court to accompany any minor returned to Mexico pursuant to that statute.

[5] The Attorney General's Office later learned Manuel had provided false information concerning his identity and age. Contact with his parents in Novalato, Sinaloa, Mexico, had resulted in Tijuana court officials obtaining documents, showing his true identity to be Jose Angel S. and true date of birth to be September 19, 1969.

to set forth in some detail the origins, guidelines and expectations of the program by which his return was accomplished.

As early as 1981 the severity of juvenile crime along the border of Mexico was the focus of concern by congressional leaders, most of whom were representatives of border states. In a letter dated August 11, 1981, Texas Senator Lloyd Bentsen pointed out an estimated 3,000 to 6,000 juveniles would cross the border over the following year and commit offenses ranging from misdemeanors to major felonies. He expressed frustration that due to an absence of formal procedures for dealing with minors on an individual basis, and the inability of the federal government's border patrol to deal with the overwhelming magnitude of the legal and social problems involved, the general response of the border states was simply to return these juveniles to the border and release them. Senator Bentsen's letter, which was signed by 14 congressional representatives, implored the federal government to formulate a foreign policy to deal with the problem. He noted that, in the absence of such federal action, the border states would be forced to grope for alternative solutions.

Upon request of the United States State Department, in January 1982 Texas conducted a study concerning the problems of nonresident alien minors committing crimes in that state. The goal of this study was to determine if effective solutions to the problem of juvenile crime along the Texas/Mexico border could be found and if there were methods by which nonresident minors could be humanely dealt with and returned to their families. As a result of this study, the Texas Juvenile Probation Commission began a course of action resulting in attempts to solve the problems at a purely local level. These attempts, however, failed. In the words of one project report: "In seeking our own solution, the things we tried were often foolish, sometimes outrageous and were not effective. [¶]We shaved the children's heads, we detained them in jail for long periods, we sent them far into the interior of Mexico. [¶] In recent years they were usually released by the police at the bridge and often they would return immediately and commit new offenses, or they were committed to Texas correctional institutions where they were separated from their families by hundreds of miles and by an international boundary. This was very expensive for the State of Texas and border crimes were increasing." Discussion of the problems was therefore broadened. Invitations to discuss the problems were sent to Mexican officials, consuls, juvenile judges and state and local juvenile officers from the border zone. The meetings with this broadened group of representatives resulted in the first Border Children's Justice Project in 1984 in Cameron County, Texas. The project gradually spread to encompass four Texas counties.

Under the Texas program, nonresident juveniles whose homes were in Mexico were returned to their homes by Mexican officials who could begin an active program to help the child and family.

Even before Texas's first border project was officially implemented, San Diego County was attempting to develop its own solutions to juvenile crime along the border. In July 1983 local San Diego officials met in Tijuana to discuss nonresident juvenile problems and coordinate the various agencies involved in dealing with those problems. Present at that meeting were representatives from the United States Border Patrol, San Diego County probation officers, police and local prosecutors' offices. Mexican officials in attendance indicated a willingness and interest in assisting San Diego in repatriating Mexican juveniles who were illegally in this country. The officials present anticipated representatives from the INS and United States Attorney's Office would participate in future discussions.

According to an August 22, 1983, letter written by the then-acting district director of the INS, the federal government agreed that after being interviewed by Mexican officials at juvenile hall, juveniles "would then be transported by [local] Probation Officers to the San Diego District Office [of the INS] where they would be processed by [its] Criminal Investigators or Deportation Officers. Once these juveniles were processed, they would be transported to Tijuana by Probation Officers and turned over to the custody of Mexican juvenile authorities. After they were returned to Mexico, the Probation Officer would notify the San Diego District Deportation Section of their departure."

According to the director "We at the San Diego District Office [of the INS] look forward to that joint effort which would result in a more effective removal process whereby Mexican National juveniles would be returned to the proper jurisdiction and eventually to the control of their families in a speedier manner."

By April 1986 the San Diego County Probation Department was attempting to formulate a program by which juveniles returned to Mexico through the INS would carry with them documents, including police reports, juvenile court readiness-hearing reports and social studies, which would detail the minor's actions in the United States. It is clear from correspondence between officials of this country and Mexico that the object of both countries was neither to impose a punishment dictated by our juvenile authorities, nor to punish minors returned to Mexico unless due to their repeat offender status Mexico felt it was appropriate to impose its own

punishment.[6] The primary goal was to return dislocated minors to their families and re-exert familial and national control over juveniles who found themselves adrift and unsupervised at the border. Mexican officials also expressed a desire to assure their nationals were being treated fairly and humanely by the United States. However, the mechanisms for creating and processing such accompanying materials in the form of an information packet had not yet been implemented; therefore, the probation director requested his juvenile field services staff send with each minor at least a cover letter identifying the individual as a nonresident alien.

The record before us is not altogether clear as to precisely when the process of sending a full information packet with nonresident Mexican minors was first implemented. The record does reflect however that Manuel was one of the first juveniles to be returned to Mexico under this system, which had been named the Border Youth Project. The guidelines in place and which were employed in Manuel's return to Mexico were not lengthy; they provided that following initial information gathering and reporting as to a minor's name and age, the deportation procedures set by the federal government were to be followed. If the minor was to be returned to Mexican juvenile officials following INS processing, a probation transportation officer was to deliver the minor and the information packet to the port of entry for delivery to Mexican officials.

The role the INS currently plays in the disposition of Mexican juveniles in San Diego has not changed since the district director wrote his letter of August 23, 1983. Nonetheless, measures the San Diego juvenile court employs in determining when it will exercise its powers under section 738 and the steps it takes to ensure Mexican authorities are fully informed of a juvenile's history at the time of any transfer, have changed since appellant was returned to Mexico. An element beyond an information packet now exists. By virtue of San Diego County Board of Supervisor action of March 1, 1988, the juvenile court now considers information about Mexican

---

[6] According to the assistant manager of the Baja California Office of Social Prevention: "In the State of Baja California there is an institution for treatment of the 2nd level. That is, the institution to which minors are sent who have a high rate of recidivism or who have carried out serious antisocial activities and who represent a risk or a high index of danger. For this reason, they are minors who should remain detained for a minimum of 3 months, during which time they are involved in carrying out work, education and sports activities, and at the same time receive social and psychological treatment.

"Minors who are sent by THE COURT OF SAN DIEGO to the MEXICAN authorities are not considered to be minors who are viable to be detained in the Institution of 2nd Level. First of all, the attempt is made to reintegrate them into their family or their place of origin. Now, when dealing with a minor who has already participated in the treatment imposed by the MEXICAN authority and again commits offenses in the USA, again having abandoned the family nucleus while he had been returned, under these circumstances this minor can be considered as one who requires treatment at the Institution of the 2nd Level."

juveniles which has been gathered by a private nonprofit corporation, Volunteers in Probation, Inc. (VIP), operating under a contract with the county.

Under its contract with the county, VIP is obligated to:

"(a) Interview all Mexican Nationals being detained in San Diego County Juvenile Hall.

"(b) Investigate and make necessary contacts to make a determination on the true names, dates of birth and residences of all Mexican Nationals. This information will be promptly furnished to Deputy Probation Officers and the San Diego Juvenile Court.

"(c) Contact the minor's parents in Mexico to inform them of their child's detention, whereabouts and possible consequences.

"(d) Assist the Deputy Probation Officers in the United States with their social study by providing any criminal record the juvenile may have in Mexico. Where necessary juvenile authorities from minor's legal residence in states of the Mexican Republic will be contacted in order to obtain this information.

"(e) Contact the minor's family regarding to their financial ability for possible payment of restitution and care expenses in the United States.

"(f) Conduct necessary interviews to expedite the process of immediate return to Mexico of minors concerning whom the San Diego Probation Department has determined not to file a petition.

"(g) Visit all Mexican Nationals being detained in Juvenile Hall on a weekly basis in order to provide current information on their situations.

"(h) Provide quarterly reports to the San Diego Probation Department's liaison officer to Mexico. These reports will consist of the dispositions and progress of minors ordered returned to Mexican authorities.

"(i) As necessary, meet with the District Attorney's Office, minor's appointed defense counsel, and Juvenile Court judges."

For these services, VIP is paid $23,000 a year.

In addition to its contract with the county, VIP has a contract with probation authorities in Baja California. Under that agreement VIP is required to provide professional services to Mexican nationals in custody in

this country. In operating the program, VIP and the county are assisted by a judge and social worker from the juvenile court of Tijuana.

When, based upon information provided by the program, the juvenile court finds transfer to Mexico is appropriate under section 738, officials of the probation department contact officials of the Tijuana juvenile court and the INS. The probation department also arranges to have the juvenile court's order and other appropriate records translated. A juvenile is then either delivered to the INS which itself transfers physical custody to Mexican authorities or the INS completes the processing necessary to deport an alien and allows the probation department to transfer physical custody to Mexican officials.

According to the uncontradicted statements of county officials, the ultimate disposition of transferred juveniles is left entirely to Mexican authorities. While the juvenile court in San Diego may express its feelings through a disposition recommendation, the probation department no longer makes recommendations as to the appropriate treatment.[7]

According to a letter sent from the Consul General of Mexico to San Diego's chief probation officer, as of June 12, 1989, there was a significant measurable reduction of minors returning to the United States from Mexico following processing under the Border Youth Project. To the best of Mexico's knowledge, only eight of over one hundred such youths returned to Mexico had reentered the United States illegally.

DISCUSSION

I

*The Constitutionality of Section 738 and the Border Youth Project*

The principle constitutional issues before us revolve around whether section 738 and the Border Youth Project violate the supremacy clause of the United States Constitution, article VI which states: "This Constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every State

---

[7] According to a supervising probation officer in the San Diego County Probation Department, when a juvenile is returned to Mexican juvenile court authorities, "Mexican court officials report that the juvenile is then delivered to the Tijuana Juvenile Hall, *where the Juvenile Court authorities will determine his disposition. We make no recommendation. Discretion is totally theirs.*" (Italics added.)

shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding."[8]

Manuel advances a number of reasons why he believes section 738 and the Border Youth Project violate the supremacy clause. We find his arguments unpersuasive.

A. *The return of nonresident alien juveniles authorized by section 738 and implemented by the Border Youth Project has not been preempted by federal laws*

■ Manuel urges this state's regulation of nonresident minors in section 738 and the Border Youth Project's implementation of that section have been preempted by both general federal interests in the area of immigration-deportation and specific acts of Congress. We disagree.

■ The principles which govern our disposition of Manuel's preemption arguments were set forth in large part by the United States Supreme Court in *De Canas* v. *Bica* (1976) 424 U.S. 351, 354-357 [47 L.Ed.2d 43, 48-50, 96 S.Ct. 933]: "Power to regulate immigration is unquestionably exclusively a federal power. See, e.g., *Passenger Cases,* 7 How. 283 . . . (1849); *Henderson* v. *Mayor of New York,* 92 U.S. 259 . . . (1876); *Chy Luna* v. *Freeman,* 92 U.S. 275 . . . (1876); *Fong Yue Ting* v. *United States,* 149 U.S. 698 . . .

---

[8] We note that in *In re Jose P.* (1980) 101 Cal.App.3d 52, 59 [161 Cal.Rptr. 400], this court concluded that in making a dispositional order appropriate to a nonresident Mexican national, our juvenile courts are required to consider whether ordering the minor returned to Mexican juvenile authorities pursuant to section 738 is an acceptable, less drastic alternative disposition to incarceration in this country. In holding Jose P. had been improperly ordered confined at the California Youth Authority, we noted: "The record does not reveal the unavailability of suitable alternative dispositions. The court has great flexibility in making an order appropriate for the individual. None has ever been attempted for Jose.

"Where a wardship is established for a minor whose residence is in a foreign country, the minor, if placed on probation, may be sent to an official of a juvenile court of such foreign country or an agency of such country authorized to accept the minor. (§ 738.)

"No reason appears on the record why these provisions relating to nonresident wards were not available in this case. If in fact there are no facilities in Mexico to which the minor may be referred, this should be made clear. If there are available facilities but they are inappropriate, the reasons should be stated." (Fn. omitted.)

By way of footnote, we observed: "[4] For instance, the Mexican state of Jose's residence, Baja California, operates 'La Granja,' a facility for juveniles roughly equivalent to a combination juvenile hall and ranch. This is operated under the court system by El Tribunal para Menores. Imperial County, which like San Diego is proximate to the Mexican border, has a reciprocal relationship with the juvenile authorities in Baja California, to allow supervision over nonresident minors in appropriate cases." (101 Cal.App.3d at p. 59.)

Although our discussion in *In re Jose P.* assumes the propriety of section 738, we were not called upon there to determine the constitutionality of that statute.

(1893). But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* preempted by this constitutional power, whether latent or exercised. . . . [S]tanding alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain. . . .

◼ ". . . . As we stated in *Florida Lime & Avocado Growers* v. *Paul*, 373 U.S. 132, 142 . . . (1963): '[F]ederal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' . . .

". . . . . . . . . . . . . . . . . . . . . . .

". . . [W]e will not presume that Congress, in enacting the INA, intended to oust state authority to regulate . . . in a manner consistent with pertinent federal laws. Only a demonstration that complete ouster of state power—including state power to promulgate laws not in conflict with federal laws—was ' "the clear and manifest purpose of Congress" ' would justify that conclusion."

With respect to the analysis by which congressional intent to oust state regulation is determined, the Supreme Court has recently stated: "In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, *Rice* v. *Sante Fe Elevator Corp.*, 331 U.S. 218 . . . (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 142-143 . . . (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, *Hines* v. *Davidowitz*, 312 U.S. 52, 67 . . . (1941). See *Schneidewind* v. *ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145 . . . (1988); *Louisiana Public Service Comm'n* v. *FCC*, 476 U.S. 355, 368-369 . . . (1986); *Pacific Gas & Electric Co.* v. *Energy Resources Comm'n*, 461 U.S. 190, 203-204 . . . (1983)." (*N.W. Cent. Pipeline* v. *State Corp. Com'n of Kansas* (1989) 489 U.S. 493 [103 L.Ed.2d 509, 527, 109 S.Ct. 1262, 1273].)

◼ In addition to these established tenets of federalism we are also bound by two principles of statutory construction articulated by the California Supreme Court. "First, the enactment may be validated if its terms are reasonably susceptible to an interpretation consistent with the Constitu-

tion. [Citations.] Second, the court should construe the enactment so as to limit its effect and operation to matters that may be constitutionally regulated or prohibited." (*Welton* v. *City of Los Angeles* (1976) 18 Cal.3d 497, 505 [134 Cal.Rptr. 668, 556 P.2d 1119].)

■ Viewing section 738 in light of the foregoing principles we conclude the federal government has not preempted California from ordering nonresident juveniles returned to their country of origin.

First, as we interpret section 738, the statute does not violate the exclusive power over immigration and deportation which the Constitution vests in the federal government. As *DeCanas* v. *Bica, supra,* 424 U.S. at page 354 [47 L.Ed.2d at page 48], makes clear, the fact aliens are the subject, in part, of the statute does not itself make section 738 a regulation of immigration. *DeCanas* instructs us that regulation of immigration, is "essentially a determination of who should or should not be admitted into the country, and *the conditions under which a legal entrant may remain.*" (*Id.* at p. 355 [47 L.Ed.2d at pp. 48-49].) (Italics added.)

In giving our juvenile courts the power to terminate custody over foreign nationals, we do not believe the state Legislature intended to abrogate any federal power over which foreign nationals may remain in this country. Rather, the language of the statute supports the conclusion the Legislature intended only that our courts have the power to release juvenile offenders from the custody of our judicial system by ordering their return to the country of origin. In light of the plenary power of the federal government over immigration and deportation, which we presume the Legislature considered in enacting section 738, we interpret that statute as allowing courts to order such minors released to federal immigration authorities for deportation by the federal government.[9]

Our interpretation of section 738 is supported not only by our duty to interpret statutes, where possible, as consistent with the Constitution but also by the actual practices employed by San Diego officials. Significantly, the record reflects all minors (including Manuel) returned to Mexico under

---

[9] In light of Manuel's status as a nonresident alien and the necessity of returning him to his country through federal deportation procedures, we reject his argument that California improperly released him to federal authorities.

In this regard, we note section 738 is silent with respect to the actual process by which foreign juvenile offenders are returned to their native countries. The statute does authorize the expenditure of county funds sufficient to assure the welfare of minors transferred and to pay the costs of juvenile court authorities who may accompany minors to appropriate foreign authorities. This attempt to assure minors are adequately cared for does not suggest any effort by California to stand in the place of federal authorities and "deport" minors.

section 738 are first presented to the INS for processing through the federal deportation system.

Because, as we have interpreted the statute, the power over foreign juveniles provided by section 738 is limited to releasing the juvenile to federal authorities for immigration processing, the statute cannot be said to violate standards of uniformity, or directly conflict with the administration of the Immigration and Naturalization Act (INA).

Moreover, given an interpretation of section 738 which mandates compliance with the federal immigration laws and regulations, it cannot be said section 738 stands as an obstacle to accomplishment and execution of congressional objectives embodied in the INA. (See *N. W. Cent. Pipeline* v. *State Corp. Com'n of Kansas, supra,* 489 U.S. at p. 510 [103 L.Ed.2d at p. 527, 109 S.Ct. at p. 1273].)

Manuel's reliance on the provisions of the Transfer of Offenders To and From Foreign Countries Act (Act), title 18 United States Code Annotated section 4100 et seq., is likewise unavailing. According to the House report accompanying its passage, the Act originated as a response to complaints received by Congress about the treatment United States citizens received in Mexican jails. (H.Rep. No. 95-720, 95th Cong., 1st Sess., reprinted in 1977 U.S. Code Cong. & Admin. News, p. 3146.) After conducting comprehensive hearings on the subject the House Committee on International Relations determined that a treaty between Mexico and the United States would be an effective way of dealing with some of the problems disclosed in the hearings. (*Ibid.*) Such a treaty was negotiated with Mexico and it provides that adult nationals of each country may, with their consent, serve their sentences in their native country. (*Ibid.*)

According to the House report "[t]he purpose of the act is to provide the implementation procedures for offender transfer treaties with Mexico and Canada as well as for similar future treaties." (H.Rep. No. 95-720, 95th Cong., 1st Sess., reprinted in 1977 U.S. Code Cong. & Admin. News, p. 3146; see also *Boyden* v. *Bell* (9th Cir. 1980) 631 F.2d 120, 122; *Scalise* v. *Meese* (N.D.Ill. 1988) 687 F.Supp. 1239, 1243.) Accordingly by its terms the Act is "applicable only when a treaty providing for such a transfer is in force, and shall only be applicable to transfers of offenders to and from a foreign country pursuant to such a treaty." (18 U.S.C.A. § 4100(a).) As used in the Act " 'transfer' means a transfer of an individual *for the purpose*

*of the execution in one country of a sentence imposed by the courts of another country."* (18 U.S.C.A. § 4101(j).)[10] (Italics added.)

There is no treaty between the United States and Mexico which provides for the transfer of juveniles such as Manuel. The Treaty on the Execution of Penal Sentences between the United States and Mexico[11] is limited to the transfer of adults. Moreover, the terms of section 738 do not require or contemplate any recognition or execution of a sentence imposed by our juvenile courts; thus orders under section 738 cannot be construed as "transfers" within the meaning of the Act. In the absence of a treaty governing juveniles, or even a "transfer" as that term is used in the Act, it is difficult to find any direct conflict between section 738 and the Act. Our preemption inquiry, of course, does not end there. (See *N.W. Cent. Pipeline* v. *State Corp. Com'n of Kansas, supra,* 489 U.S. at p. 510 [103 L.Ed.2d at p. 527, 109 S.Ct. at p. 1273].)

We are also persuaded that given the express terms of the Act and the limited purpose of the Act, as stated in the House report, there is no intent by Congress to preclude state regulation which is in harmony with federal law. As we have seen, the Act was only designed to provide procedures necessary to implement treaties and by its terms the Act only applies where a treaty exists. (H.Rep. No. 95-720, 95th Cong., 1st Sess., reprinted in 1977 U.S. Code Cong. & Admin. News, p. 3146; 18 U.S.C.A. § 4100.) Given these clearly expressed limitations on the scope of the Act and in the absence of any evidence to the contrary, we cannot accept Manuel's implicit assertion Congress meant to oust state regulation over foreign offenders in cases, such as this, where no treaty exists.

Finally, given its origins in a desire by Congress to alleviate the conditions under which Americans are held in foreign jails, we cannot discern how section 738 impairs any broad congressional objective. In particular we note an offender ordered returned to juvenile authorities in Mexico is entitled to all federal rights currently reserved to individuals deported to countries which have no prisoner exchange treaty with this country. More importantly, the unconditional release of foreign juveniles to American immigration authorities and their deportation under federal law is unrelated in practical or theoretical terms to the entirely separate goal of repatriating Americans incarcerated abroad.

---

[10] " '[S]entence' means not only the penalty imposed but also the judgment of conviction in a criminal case or a judgment of acquittal in the same proceeding, or the adjudication of delinquency in a juvenile delinquency proceeding or dismissal of allegations of delinquency in the same proceedings." (18 U.S.C. § 4101(h).)

[11] Treaty Between the United States of America and the United Mexican States on the Execution of Penal Sentences, November 25, 1976, United States-Mexico, 28 U.S.T. 7399, T.I.A.S. 8718.

In summary, in this area of concurrent interests and permissible regulation, there is no implied or express signal from Congress which preempts state orders directing the return of alien minors to their homes. Thus in view of our conclusion that section 738 defers to federal deportation law, we can discern no congressional objective violated by the statute.

For the reasons noted, we find the Border Youth Project likewise has not been preempted by the federal government. Contrary to Manuel's assertions, the project does not constitute a "deportation" process. Indeed it requires any minor ordered returned to his country of origin be processed through the INS deportation procedures. It was thus the federal government, not San Diego juvenile authorities, which deported Manuel. We discern no conflicts, express or implied between federal deportation and prisoner transfer procedures and the Border Youth Project's goal of assuring minors returned by the federal government are accompanied by information concerning their conduct in this state and the treatment they received in our juvenile court.

B. *The compact clause has not been violated*

■ A further question has been raised as to whether in permitting a juvenile court to order the return of a nonresident minor to officials of the country charged with the care of the minor, California has violated the compact clause of the Constitution. (§ 10, art. I, U.S. Const.) That clause provides in part: "No State shall, without the consent of Congress, . . . enter into any agreement or compact with another State, or with a foreign power." We find no violation of the compact clause.

■ While in a broad sense the term "compact" may encompass any form of agreement, specific indicia are traditionally deemed necessary in order to conclude a compact exists within the meaning of article I. Those indicia include existence of a joint organization or body involved in regulation of the two governments, a prohibition on either government terminating its participation unilaterally and reciprocal enforcement of sentences or orders. (*Northeast Bancorp* v. *Board of Governors, FRS* (1985) 472 U.S. 159, 175 [86 L.Ed.2d 112, 125-126, 105 S.Ct. 2545].)

■ Moreover, even where these indicia are present a compact may nonetheless pass constitutional muster. As was noted by the United States Supreme Court in *Northeast Bancorp* v. *Board of Governors, FRS, supra,* 472 U.S. at pages 175-176 [86 L.Ed.2d at page 126]: " 'The application of the Compact Clause is limited to agreements that are "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy

of the United States." ' *New Hampshire* v. *Maine,* 426 U.S. 363, 369 . . . (1976), quoting *Virginia* v. *Tennessee, supra,* 148 U.S., at 519 . . . ."

■ With these thoughts in mind, we note that on its face, section 738 does not require or invite any form of agreement with any foreign power. It does nothing more than permit this state to order the removal from its borders of alien minors who have conducted themselves so as to come within the jurisdiction of the juvenile court. There can be no doubt but that California has such power.

The restriction on the power of states which is set forth in the compact clause has never been used to interfere with the general police power of the states over aliens within their borders. The United States Supreme Court has spoken to this power. ■ In rejecting the argument a state regulation interfered with foreign or interstate commerce because it required the master of every vessel arriving from a foreign port or from another state to provide written information as to every person on board, the court stated: "We choose rather to plant ourselves on what we consider impregnable positions. They are these: that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive." (*New York* v. *Miln* (1837) 36 U.S. 102, 139 [9 L.Ed. 648, 662].)

■ In particular, the power of a state over aliens who have committed crimes within its territory has never been subject to intrusion by the federal government. The lack of federal intrusion into this area of internal state regulation is underscored in the plurality opinion in *Holmes* v. *Jennison* (1840) 39 U.S. 540 [10 L.Ed. 579]. There, Chief Justice Taney wrote an opinion which found states had no power to honor an *extradition* request from Canada. However in doing so the Chief Justice took great pains to reaffirm the broad power states have over prisoners who have committed criminal acts within the state. "Again: the question under this habeas corpus is in no degree connected with the power of the States to remove from their territory any person whose presence they may think dangerous to their

peace, or in any way injurious to their interests. The power of the States in that respect was fully considered by this court and decided in the case of *New York* v. *Miln,* 11 Peters, 102. *Undoubtedly, they may remove from among them any person guilty of,* or charged with *crimes,* and may arrest and imprison them in order to effect this object. This is a part of the ordinary police powers of the States, which is necessary to their very existence, and which they have never surrendered to the general government. . . . In all of these cases the State acts with a view to its own safety; and is in no degree connected with the foreign government in which the crime was committed. The State does not co-operate with a foreign government nor hold any intercourse with it, when she is merely executing her police regulations. But in the case of Holmes, it is otherwise. The State acts not with a view to protect itself, but to assist another nation which asks its aid. *Holmes is not removed from the State of Vermont, as a man so stained with crimes as to render him unworthy of the hospitality of the State; but he is delivered up to the Canadian authorities, as an act of comity to them.* This is not the exercise of a police power, which operates only upon the internal concerns of the State, and requires no intercourse with a foreign country in order to carry it into execution: it is the comity of one nation to another, acting upon the laws of nations, and determining, for itself, how far it will assist a foreign nation in bringing to punishment those who have offended against its laws." (*Id.* at pp. 568-569 [10 L.Ed. at p. 593], italics added.)

The importance of the distinction drawn by Chief Justice Taney in *Holmes* v. *Jennison* to the outcome of this case is difficult to overstate. Manuel was incarcerated by California authorities for acts committed here. The power of California courts over him was predicated solely upon commission of those acts and not upon the desires of Mexico. The fact California's powers over Manuel include, under section 738, the power to cause his removal from within its borders is entirely consistent with Chief Justice Taney's views. Indeed the plurality opinion in *Holmes* v. *Jennison* and the opinion in *New York* v. *Miln* contemplate such power.[12]

---

[12] We also note the substantial interest and power of states over aliens charged with state offenses has been recognized by the executive branch of the federal government. State Department regulations provide that "No alien shall depart, or attempt to depart, from the United States if his departure would be prejudicial to the interests of the United States under the provisions of [22 C.F.R.] § 46.3." (22 C.F.R. § 46.2(a).) 22 Code of Federal Regulations section 46.3 in turn provides: "The departure from the United States of any alien within one or more of the following categories shall be deemed prejudicial to the interest of the United States: . . . (g) Any alien who is needed in the United States as a witness in, or as a party to, any criminal case under investigation or pending in a court in the United States: Provided, that any alien who is a witness in, or a party to, any criminal case pending in any criminal court proceeding *may be permitted to depart from the United States with the consent of the appropriate prosecuting authority,* unless such alien is otherwise prohibited from departing under the provisions of this part." (Italics added.)

In light of California's undisputed police power over Manuel, including the power to cause his removal from this state, we conclude section 738 does not violate the compact clause of the Constitution.

With respect to the Border Youth Project, it is true that in a broad sense there exists an "agreement" with Mexico to exchange information about minors who have illegally left that country. However, this is not an "agreement" in the sense that term is used to denote an article I compact between a state and a foreign sovereign. No joint organization or body regulates the two governments. Each government is free to modify or terminate its participation unilaterally, and neither government entity requires reciprocation of any order or sentencing. (See *Northeast Bancorp* v. *Board of Governors, FRS, supra,* 472 U.S. at p. 175 [86 L.Ed.2d at pp. 125-126].) Moreover, we are at a loss to discern how the termination of jurisdiction and return of a minor to his country of origin through the federal deportation process enhances the political power of either San Diego or Mexico.

*C. Section 738 and the Border Youth Project do not violate the federal government treaty making power or its power to control foreign policy*

■ Where the exercise of power is reserved exclusively for the federal government, all state laws on the subject are per se invalid. (*Southern Pacific Co.* v. *Jensen* (1917) 244 U.S. 205, 209 [61 L.Ed. 1086, 1095, 37 S.Ct. 524, 529].) ■ Manuel asserts section 738 and the Border Youth Project violate this principle by infringing upon both the treaty clause which provides "No State shall enter into any treaty, alliance or confederation" (U.S. Const., art. I, § 10) and the federal government's "full and exclusive responsibility for the conduct of affairs with foreign sovereignties." (*Hines* v. *Davidowitz* (1941) 312 U.S. 52, 63 [85 L.Ed. 581, 584, 61 S.Ct. 399].)

Clearly, however, section 738 does not constitute an attempt on the part of this state to enter into a treaty or agreement with any foreign power. Nor does it invite such treaty or agreement. Moreover, in no way does section 738 purport to bind or invite the binding of any foreign power to a judgment or sentence entered in this country. The face of the statute merely allows the juvenile court to order nonresident juveniles returned to the foreign agency charged with their care.

Moreover, since section 738 neither contemplates nor requires a treaty, and does not contemplate foreign recognition of a California order or judgment, the statute does not implicate the exclusive federal power over foreign relations.

We next turn to Manuel's contention the Border Youth Project violates the exclusive federal prerogative over foreign relations. In doing so, it is important to focus upon several points.

Initially, we note the procedures by which Manuel was processed by the Border Youth Project in June 1987 are not the procedures which are being used today. As we have previously set forth the Border Youth Project has evolved from a general concept of sending a minor home with information concerning his activities in this county to a more structured program of assistance.

In March 1988 the VIP entered into separate agreements with both Mexico and the County of San Diego to monitor and assist individuals being returned to Mexico. Because Manuel was not processed under this newly revised program, we decline to comment upon its validity. Our unwillingness to go further is not borne out of any doubts concerning the validity of the program as it currently exists but because of our sharply curtailed power to issue purely advisory opinions. (See *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 171 [188 Cal.Rptr. 104, 655 P.2d 306].) While observations noted here may apply equally to the newly revised program, for purposes of examining Manuel's contentions, we focus only upon the Border Youth Project as it existed at the time Manuel was returned to Mexico.

Having so limited the scope of our factual inquiry, we proceed to examine the nature of the Border Youth Project in June 1987.

Just what "agreement" existed between officials of the San Diego juvenile court and the Mexican authorities at the time Manuel was ordered returned to Mexico is the subject of disagreement between the parties.

Manuel asserts the agreement between Mexican and San Diego officials is that Mexico will incarcerate those minors returned under the Border Youth Project for the period of time requested by the San Diego court or, worse, will incarcerate the minor for a longer period of time. We find no support for such a conclusion in this record. Indeed, it is abundantly clear Mexico is not bound and has never intended to be bound by any sentence or recommendation proposed by our juvenile court. This is best exemplified by Manuel himself, who, despite a juvenile court recommendation he be placed in camp, was sent home to his parents by Mexican juvenile authorities. It is equally clear San Diego juvenile authorities have not entered into any agreement, oral or written, which has as a basis an expectation the orders or recommendations of our authorities will be implemented by Mexican juvenile authorities.

What then had San Diego "agreed" to? We have given more than adequate opportunity for the parties to present to this court any agreement, oral or written, which existed at the time Manuel was sent home. None has been produced. We have searched the record for such an "agreement." None is apparent.

What is abundantly clear from the record is that Mexican and American authorities "agreed" to communicate on a local level concerning a complex problem of substantial magnitude and further, that during the process of a juvenile's return to either country, they would cooperate in the sharing of information concerning particular minors in an effort to humanely return these minors to their families. Indeed the genesis of the San Diego border project was an attempt to do nothing more than create a packet of information which would "flag" Mexican juvenile officials to the conduct of a particular minor and the disposition of his case in our juvenile court.

The efforts the juvenile court and the probation department make to ensure Mexican officials are given as much information as possible about the juvenile's record in this country represent a laudable attempt to share information significant to authorities in California and Mexico. How Mexico chooses to act upon such information (if indeed it chooses to act at all) where a minor has been properly returned under our INS procedures is not and cannot be controlled by this state. Contrary to Manuel's argument, we do not believe such cross-border communication encroaches upon the supremacy of the federal government, requires a treaty or otherwise implicates exclusive federal power over foreign relations.

We are unaware of any authority which suggests that in this era of complex social and economic problems along our borders, not the least of which are border crime and displacement of nonresident children, border jurisdictions cannot share information about public safety issues absent a federal treaty or other federal action. Rather, the conduct of the executive branch of the federal government in this case suggests quite the contrary. As we have seen, having been made aware of the difficulties posed by alien juvenile offenders, the United States State Department—the agency directly responsible for the conduct of our foreign affairs—asked the State of Texas to conduct a study of the problem. This deference by the federal government to state expertise is dramatic recognition of the legitimate interest and competence of the states in dealing with public safety in border areas. The active cooperation of the INS in the Border Youth Project underlines the federal government's recognition of the states' legitimate role in solving a public safety crisis. Where, as here, state officials charged with protecting public safety along the border have found it necessary to share information with foreign officials, both reason and the conduct of the federal govern-

ment suggest the officials may do so without interfering in our nation's foreign policy interests.

## II

### *Due Process*

 Manuel alleges his return to juvenile authorities in Mexico violated his right to due process.

#### A. *Right to appeal*

Principal among Manuel's contentions is that he has been denied his right to appeal the juvenile court disposition. He points out that under section 738 and the Border Youth Project procedures, juveniles who exercise their right to appeal may not receive effective relief because once return occurs, this court has no power over Mexican authorities.

However, while still represented by counsel, Manuel waived his right to protest his return to Mexico and, indeed, signed a formal written waiver of his right to a hearing at which the existence of his pending appeal may have been considered.[13]

In addition to the availability of the formal deportation process, Manuel could have requested the juvenile court exercise its discretion and stay the enforcement of its order to return him to Mexico. The court had such power in this case regardless whether an appeal from its judgment had been taken. (Code Civ. Proc., § 918, subds. (a), (c).)[14]

Along with a request the superior court stay its order pending appeal, Manuel could have filed a writ of supersedeas in this court. This writ is designed to eliminate the precise harm Manuel claims has occurred since its sole functions are to preserve appellate jurisdiction pending a ruling on the merits, and protect the appellant from injury in the case of reversal. (Code Civ. Proc., § 923;[15] *Davis* v. *Custom Component Switches, Inc.* (1970) 13

---

[13] Manuel has elected not to challenge the federal proceedings, and thus we assume they were conducted properly.

[14] Code of Civil Procedure section 918, subdivisions (a), (c) provide: "[T]he trial court may stay the enforcement of any judgment or order. . . . [¶] This section applies whether or not an appeal will be taken from the judgment or order and whether or not a notice of appeal has been filed."

[15] Code of Civil Procedure section 923 provides: "The provisions of this chapter shall not limit the power of a reviewing court or of a judge thereof to stay proceedings during the pendency of an appeal or to issue a writ of supersedeas or to suspend or modify an injunction during the pendency of an appeal or to make any order appropriate to preserve the status

Cal.App.3d 21, 28 [91 Cal.Rptr. 181]; *In re Batey* (1959) 175 Cal.App.2d 541 [346 P.2d 540]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 214, pp. 221-222.) In filing a writ of supersedeas in this court Manuel could have requested this court stay his return to Mexico or at a minimum stay his return pending review of his writ. (Code Civ. Proc., § 923; *Voorhies* v. *Greene* (1983) 139 Cal.App.3d 989, 995-996 [189 Cal.Rptr. 132]; *Peninsula Prop. Co.* v. *County of Santa Cruz* (1951) 106 Cal.App.2d 669, 673 [235 P.2d 635]; 9 Witkin, Cal. Procedure, *supra,* Appeal, § 233, pp. 241-242.)

Finally, section 800, which provides for appeal of a judgment in a proceeding under section 602, grants the superior court the discretionary power to release the minor pending appeal. It is true this provision assumes there is someone to whom a minor such as Manuel can be released. However, had Manuel sought release under this section he may have been able to present such a suitable person or suggest a less onerous alternative to incarceration at California Youth Authority (CYA). The significant observation is that Manuel did not seek this available alternative in the superior court.

We agree with Manuel that he, and other minors ordered returned to juvenile authorities in Mexico, must have available procedural avenues which effectively preserve their full appellate rights. However, such avenues exist. The problem here is that Manuel at no time sought to avail himself of any of them.

Since Manuel was represented by able trial counsel who was ordered to remain on this case until statutory time for application of appeal had passed, and the appeal here was filed prior to his leaving this country, we can only assume Manuel, with the assistance of counsel, concluded it was in his best interest to return home regardless of his pending appeal. Under the circumstances presented here Manuel has not been deprived of due process.

B. *Loss of habeas corpus rights*

Manuel asserts his return to Mexico resulted in suspension of his right to file a writ of habeas corpus. This argument would contain more force if Manuel had not consented to deportation to Mexico. Had he in any manner challenged his return, through request of a formal deportation hearing or state processes designed to stay his return to that country pending review by this court, he could certainly have brought such a writ. By his voluntary return he voluntarily waived any effective use of that writ process.[16]

---

quo, the effectiveness of the judgment subsequently to be entered, or otherwise in aid of its jurisdiction."

[16] Manuel's reference to those individuals who may be incarcerated in Mexico following return under section 738 and/or the Borders Youth Project does not assist his argument since the circumstances surrounding the return of these individuals is not before us.

## C. *Participation by state officials*

Manuel asserts his return violated due process because state officials "participated" and somehow engaged in collusion with Mexican juvenile officials. As we have seen, however, the language of section 738 permits county probation officers to be dispatched to assist in a deportation. We discern no impairment of due process or impermissible collusion in a procedure clearly intended to assure the safety and welfare of a minor. Moreover, since there is no agreement between the United States and Mexico as to any "sentence" to be imposed upon the minor's return to Mexico, we are hard pressed to discern collusion.

## D. *Confinement*

Manuel contends his confinement in Mexico violated due process standards because he was placed outside the protection of the Constitution and further the confinement constituted cruel and unusual punishment. The fallacies in his argument are several. First, he waived all procedures by which he could have sought to remain in this country. Moreover, he was not sentenced to serve any term of confinement in Mexico. He was simply returned to his country of residence, Mexico. Indeed, his dispositions involved no punishment whatsoever by either this country or Mexico.

Given the constitutionality of section 738 and the Border Youth Project we can perceive there will be numerous instances where a disposition ordering a return to Mexico for a particular minor constitutes a far more beneficial and lenient treatment for a child than incarceration in this country. It is indeed anomalous that were we to agree with Manuel we would be accepting an argument that a speedy return to his family was improper and he should have been incarcerated in this country for up to 240 days. This makes no sense at any level of analysis.

We choose to stand on our observations in *In re Jose P., supra,* 101 Cal.App.3d 59, where we concluded the juvenile court should consider a minor's return to his or her country of origin as possibly the least detrimental sentence alternative.

## E. *Powers of negotiation and commutation*

Among Manuel's final due process assertions are those urging the Governor's power to commute his sentence has been impaired and the President's power to pardon curtailed. Assuming such avenues exist for the benefit of minors, we perceive of no reason why Manuel is not free to petition these entities through his counsel in this country.

F. *Contacting parents*

Manuel asserts due process requires parents be notified prior to any finding of delinquency. The record before us does not set forth what procedures, if any, were actually employed at the outset to properly identify Manuel, locate his parents and notify them of their child's presence in this country. We do note that at no time in the juvenile process did Manuel or his counsel apparently request parental contact and, indeed, the information supplied by Manuel concerning his name and date of birth were not correct. It thus appears he did not wish to be identified.

We note that under the VIP program which took effect March 1, 1988, and which Manuel presumably finds objectionable, volunteers now do precisely what Manuel suggests, i.e., contact the minor's parents in Mexico to inform them of their child's detention, whereabouts and possible consequences.

Manuel's argument is a tacit recognition of the need for cooperation between juvenile authorities here and in Mexico. In light of the record before us and the existence of procedures by which contact with parents is now sought early in the detention process, we do not believe Manuel's argument merits overturning the order under which he was returned to Mexico or the program by which he was returned.

### III

### *Equal Protection*

Manuel asserts he was denied equal protection because he was sentenced to prison in Mexico for crimes committed in this state and he may be held indefinitely. We agree with respondent. Nothing in this record remotely suggests Manuel was sentenced to a Mexican prison. He was properly returned to his country which returned him to his parents.

### CONCLUSION

Neither Welfare and Institutions Code section 738 nor the Border Youth Project as it existed at the time of Manuel's transfer impinges upon the supremacy of the federal government. Nor do they violate Manuel's due process rights.

Judgment affirmed.

Nares, J., concurred.

**WIENER, Acting P. J.**—I dissent.

I believe Welfare and Institutions Code section 738 does not authorize San Diego County to negotiate and implement an agreement with the juvenile court of Tijuana, Mexico, relating to juvenile court dispositional orders which involve Mexican nationals. I also conclude the Border Youth Project as implemented here violated Manuel's rights of due process. I reach these conclusions even though the Border Youth Project undoubtedly reflects the conscientious efforts of local governments to resolve the problem of border crime and may actually be a salutary alternative to juvenile court dispositions.

Under our form of government there are times when courts must declare governmental action unconstitutional—even action perceived to be benign. I am satisfied that this is such a time. What occurred to Manuel here and what can occur to similarly situated Mexican juveniles is contrary to our basic notions of federalism and the requirements of due process of law. The majority's holding sanctioning governmental units large and small throughout this state and the United States to negotiate with their counterparts in foreign countries for the disposition of juvenile offenders ignores well-recognized principles governing our federal structure which require that such arrangements be negotiated at the national, not local, level.

I

Before discussing these points in greater detail I first comment on the majority's characterization of this case.

While the opinion may correctly describe Manuel's involvement with the California juvenile justice system, the opinion suggests each procedural step was nothing more than an innocuous event occurring within a generally beneficial scheme designed to assist Mexican alien juvenile offenders. The court proceedings and later dispositional order directing Manuel's delivery to the officials of the Tijuana, Mexico juvenile court appear to be almost irrelevant. This kindly paternalism is manifested in the opinion in a number of ways including language such as Manuel was "released" to federal Immigration and Naturalization Service (INS) officials (maj. opn., *ante*, p., 54), as if California had relinquished its hold on him and he was free to do as he pleased. In effect the majority would have us believe the juvenile court's involvement in this and similar cases is solely to obtain information about Mexican juveniles so that when they are returned to Mexico the authorities there will be better informed and render a more enlightened disposition.

If the majority were correct in describing what happened to Manuel and what now happens to similarly situated minors, one would seriously

question the need for formal juvenile court proceedings here and the complex negotiated, structured relationship between San Diego and Tijuana. All that would be necessary would be a telephone call by the juvenile authorities to the INS or to their counterparts in Mexico for delivery of the juvenile to that country. There would be no need for a trial in the juvenile court to prove the petition's allegations beyond a reasonable doubt. It is remarkable to think that the juvenile court in this county would use its resources solely to develop information for transmittal purposes to a foreign country. The legal efforts in this case and the different views of this panel reflect that much more is involved than an ad hoc process in which juveniles are returned to Mexico.

It is undisputed that pursuant to the Border Youth Project one judge and one social worker from Mexico are now assigned to this project. In addition to their duties in Mexico, they come to the United States to assist San Diego County probation officers in identifying the Mexican youth and obtaining other necessary information. Following initial screening to determine the identity of the undocumented juvenile offender, Volunteers in Probation (VIP), the project contractor, attempts to contact the juvenile's parents. VIP then assists the probation officer in the completion of a social study which outlines the juvenile's prior criminal record, if any.

At this point the authorities use a two-tier procedure following an initial decision whether to prosecute the undocumented juvenile offender. The decision to prosecute, based on the social study and recommendation submitted by the probation department under Welfare and Institutions Code section 725, involves consideration of the juvenile's age, prior record and seriousness of the current offense.

Tier One cases are those in which a decision is made *not* to prosecute. In these cases the juvenile is delivered to the INS where processing normally involves obtaining the juvenile's written consent to voluntarily return to Mexico. The juvenile is then delivered by INS to Tijuana juvenile authorities for further disposition. If the juvenile refuses to voluntarily return to Mexico and requests a deportation hearing, he or she is immediately placed in custody by INS and a formal hearing is scheduled.

Tier Two cases are those in which San Diego County authorities decide to prosecute the juvenile offender. Following disposition by the juvenile court, the undocumented Mexican juvenile is delivered to INS for processing. It is unclear whether INS or the probation officer delivers the minor to Tijuana juvenile authorities for reunion with his or her family, supervision and rehabilitation through the Tijuana juvenile court or institutionalization for more serious offenders.

Between July 1987 and May 1988 the San Diego County Juvenile Court handled over 300 delinquency cases involving undocumented Mexican youth. Of this number, 47 were referred to the Tijuana juvenile court. "The remainder have been 'deported' by the INS to some unknown fate, sent to the Juvenile Ranch Facility, or committed to the California Youth Authority." Program statistics gathered at the end of the Border Youth Project's first year show that 57 Mexican nationals were ordered transported to the juvenile court in Mexico, of which 54 were actually returned. The discrepancy is due to the fact that one juvenile escaped from juvenile hall awaiting placement, a second was discovered to be an adult and a United States citizen, and the third refused to go to the Mexican official and was processed through INS. The information furnished to us also shows the following alternatives used in disposing of the cases ordered returned to the juvenile court authorities in Mexico.

"A) Number of wards transported to their legal place of residence in the interior of Mexico and released to their families. *28*

"B) Number of wards placed on probation and supervised in Tijuana and Ensenada. *14*

"C) Number of wards placed in Mexican juvenile camp facility in Mexicali. *2*

"D) *1* ward placed in Mexico state prison, as he was an adult and had an outstanding warrant for his arrest.

"E) *1* ward placed in a Catholic group home for boys.

"F) *1* ward was delivered to Mexico Immigration for return to his legal place of residence in San Salvador.

"G) *1* ward escaped from the juvenile facility in Tijuana, Mexico.

"H) Number of wards presently detained in the juvenile facility in Tijuana, Mexico. *6*

"I) Number of Mexican nationals placed in this program and re-arrested in the United States. *3*"

Because of adverse publicity describing conditions at the Tijuana juvenile jail during the first year of the program's operation (see McDonnell, *Migrant Youths Face Trip to Crowded Tijuana Jail; Tales of Beatings, Torture, Fights Greet Minors Returned by Border Patrol,* Los Angeles Times (Apr.

10, 1988) Metro, part 2A, p. 1, col. 3) the probation department investigated treatment of participants in the Border Youth Project. It determined that none of the wards detained in the Tijuana juvenile facility reported mistreatment. At the end of April 1988 the probation department stated its only concern was overcrowding.

The purpose of the foregoing is to emphasize that I see this case as one involving an organized ongoing program in which the juvenile authorities in San Diego decide cases and then use specified criteria to determine whether they should prosecute, and if so, whether their dispositional orders should include transfer of the minor determined to be a ward of the California court to the juvenile court in Tijuana, Mexico, leaving to that jurisdiction the scope of the punishment to be imposed. To say the least I find the notion of "trial here, punishment there" to be startling, particularly where the punishment "there" is open ended. For obvious reasons, aside from macabre speculation, I can take no solace from the majority's inference that the project must be beneficial because "only eight of over one hundred such youths returned to Mexico had reentered the United States illegally." (maj. opn., *ante*, p. 60.)

I have similar feelings with the majority's treatment of Manuel's due process rights. It is indeed unusual for a silent record to support a waiver of such rights and to conclude those rights, specifically the right to appeal, can be protected only if the affected individual has the foresight to seek supersedeas pending the appeal. One must not only question the constitutional validity of such a novel solution in this type of case where appellate rights are traditionally unconditional, but also its practicality when the majority also decide it was the federal government, not the San Diego authorities, which deported Manuel. (maj. opn., *ante*, p. 54.) Under the majority's premise a state court-issued supersedeas would have no effect on federal deportation actions and consequently supersedeas would have been ineffective.

The majority's desire to approve what occurred here is also reflected in its decision near the conclusion of its lengthy opinion to limit the scope of its legal analysis and factual inquiry regarding the Border Youth Project to June 1987, the time Manuel was returned to Mexico. Using this technique to conclude there was no "agreement" between San Diego and Tijuana (a factually unsupported conclusion) and thus no constitutional impediment, it is surprising the majority did not merely say this case was moot. One cannot square the majority's earlier statement that "this case involves a question of public interest which is likely to recur yet evade review" (see maj. opn., *ante*, fn. 2, p. 53) with its later decision to decline comment on the validity of the Border Youth Project (see maj. opn., *ante*, p. 70) as it existed shortly after Manuel's case and continues to exist as presented to us

in the supplemental material furnished at our request. The only inference to be drawn from our several requests was that we intended to decide the constitutional validity of the program as formally constituted. To avoid confronting that issue at this stage of the proceedings is an affront to those many persons who graciously furnished that information and the lawyers who briefed this case with the expectation that we would decide whether the program as it actually exists meets constitutional standards. But rather than ponder on the motivations of the majority and point out other numerous inconsistencies in the majority opinion, I set forth the reasons I believe warrant a reversal.

## II

### Preemption, the Treaty Clause and Prisoner Transfers

The supremacy clause of the United States Constitution, article VI, states: "This Constitution and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding."

When federal and state statutes regulate the same area, the validity of the state law turns on whether the federal government is exercising exclusive or concurrent power. Where the power exercised is reserved exclusively for the federal government, all state laws on the subject are per se invalid. (*Southern Pacific Co. v. Jensen* (1917) 244 U.S. 205, 209 [61 L.Ed. 1086, 1095, 37 S.Ct. 524, 529].) In areas of concurrent power, federal law preempts state law where 1) the issue regulated requires national uniformity in its application, 2) Congress has through its action intended to preempt the field, and 3) the state law presents a serious danger of conflict with the administration of the federal program. (*Pennsylvania v. Nelson* (1956) 350 U.S. 497, 502-505 [100 L.Ed. 640, 652-654, 76 S.Ct. 477, 480-482]; *Dolores Canning Co. v. Howard* (1974) 40 Cal.App.3d 673, 679, 681 [115 Cal.Rptr. 435].)

In one form or another it has been frequently stated that "the federal government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties." (*Hines v. Davidowitz* (1941) 312 U.S. 52, 63 [85 L.Ed. 581, 584, 61 S.Ct. 399, 402].) "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." (*Id.* at p. 63 [85 L.Ed.2d at p. 585].) Thus it is clear that

where the relations between the United States and other sovereign nations are involved, concurrent state power is defined narrowly. (*Id.* at p. 68 [85 L.Ed.2d at p. 587].)

The United States Constitution contains two separate clauses barring states from entering into treaties, compacts and agreements with foreign nations. The treaty clause states that "No State shall enter into any treaty, alliance or confederation . . . ." (Art. I, § 10.) Although the word "treaty" has more than one meaning in international parlance, under our Constitution the term refers specifically to an international agreement concluded by the President with the advice and consent of two-thirds of the Senate. (*Weinberger* v. *Rossi* (1982) 456 U.S. 25, 29 [71 L.Ed.2d 715, 720, 102 S.Ct. 1510].) It is clear that the informal arrangement between the County of San Diego and Tijuana juvenile authorities does not come within the constitutional definition of "treaty."

It should be equally clear that when a California city or county negotiates an agreement with its counterpart in Mexico for the transfer of juveniles and the execution of juvenile court dispositional orders, this amounts to negotiations with a foreign country for the transfer of "offenders" to that foreign country for the execution of penal sentences.[1] However, "the courts of no country execute the penal laws of another" (Chief Justice Marshall in *The Antelope* (1825) 23 U.S. 66, 123 [6 L.Ed. 268]) except when the sovereign power chooses to do so through a treaty or other mutual obligation. (*Rosado* v. *Civiletti* (2d Cir. 1980) 621 F.2d 1179, 1192.) "Unless required to do so by treaty, no state [country] enforces the penal judgments of other states [countries]." (Rest.3d Foreign Relations Law (1987) § 483, p. 614.) Pursuant to that power, "[t]he United States has entered into treaties with several states, including Mexico and Canada, that provide for the repatriation of prisoners to complete their sentences in their home state." (*Ibid.*)

The need for the federal government—and not the several states—to negotiate such treaties should be obvious. One need not ponder long to appreciate the chaos that would develop if representatives from every city, county and state in the United States were authorized to negotiate with foreign countries for the enforcement of their penal laws and the transfer of persons incarcerated within the geographical limits of such state, county, or city. The notion is entirely contrary to the principal of federalism which governs us. (See *Holmes* v. *Jennison* (1840) 39 U.S. 540, 578 [10 L.Ed. 579, 598] (with respect to extradition "[t]he confusion and disorder which would arise from the exercise of this power by the several States, is too obvious to need comment").)

---

[1] See discussion of statutory definitions of "offenders" for purposes of international prisoner transfer, *post,* at page 83.

*Welfare and Institutions Code Section 738*

Thus I begin my analysis of the constitutionality of Welfare and Institutions Code section 738 by viewing it within the framework provided by the supremacy clause and narrow definition of concurrent state power in foreign affairs.

Even if I were to speculate and interpret the United States Constitution as permitting the federal government to delegate to some or all of the states the authority to negotiate agreements with foreign countries to resolve local problems, there is no suggestion that California was given that authority here. The Attorney General concedes that section 738 was adopted without reference to express treaty authorization or federal legislation.

Unfortunately there is virtually no legislative history to guide me regarding the portion of section 738 with which I am concerned. As originally enacted as part of a new Welfare and Institutions Code in 1937, section 738 dealt only with the transfer of nonresident juvenile wards between states within the United States. (Stats. 1937, ch. 369, pp. 1037-1038.) The juvenile court system was revamped in 1961 as a result of the report of the Governor's Special Study Commission on Juvenile Justice. Although the report recommended only minor revisions to section 738 (Rep. of the Governor's Special Study Com. on Juvenile Justice, pt. 1 (Nov. 1960) p. 79), the actual 1961 amendment to section 738 added the language authorizing transfer of juveniles to their foreign country of residence. (Stats. 1961, ch. 1616, pp. 3488-3489.) I am unable to find any express reason why the Legislature added the language under discussion here. Nonetheless, in deference to the Legislature, I believe it can be reasonably inferred that its intent was to expand the scope of interstate cooperation contemplated by the initial enactment. In light of the proximity of international borders and the increased mobility of international travel, presumably the Legislature wanted to include the lawful cooperative efforts between this country and foreign countries. Implicit in this action is the Legislature's awareness that such efforts could only occur in the context of a valid treaty negotiated at the national level with federal legislation to implement the treaty. Accordingly, I interpret section 738 as reflecting the state's subordinate power to permit the transfer of juvenile offenders to their country of origin only when that transfer can be accomplished in accordance with federal law.

Here the existing prisoner exchange treaty between the United States and Mexico is limited to adult offenders. It is apparent from the language of the treaty that the parties wished to reach a separate agreement on the transfer of juvenile offenders at some future time.

"This Treaty may also be applicable to persons subject to supervision or other measures under the laws of one of the Parties relating to youthful offenders. The Parties shall, in accordance with their laws, agree to the type of treatment to be accorded such individuals upon transfer . . . ." (United States-Mexico Treaty on the Execution of Penal Sentences (1976-1977) art. VIII, 28 U.S.T. 7399, 7407.) To date the United States and Mexico have failed to execute a treaty to deal with juveniles.[2]

## The Border Youth Project

The Attorney General argues there is no problem with the Border Youth Project because juveniles are not "prisoners" and juvenile dispositions are not "penal sentences." He asserts Manuel's delivery to Tijuana juvenile authorities did not constitute a "prisoner transfer."

However, the federal legislation which implements the transfer of prisoners to or from foreign countries pursuant to existing or future treaties (18 U.S.C. § 4100 et seq.) encompasses minors who are the subject of juvenile court dispositions. The reciprocal benefits discussed in the legislative history (see, e.g., U.S. Sen. Judiciary Com. Rep. No. 95-435, Sept. 15, 1977) include benefits available to the juvenile offender as well as the adult offender. (Hearings Before the House Subcom. on Immigration, Citizenship, and Internat. Law, Com. on the Judiciary, on H.R. No. 7148, 95th Cong., 1st Sess., pp. 139-140.) Furthermore, the federal statute expressly defines "offender" as "a person who has been convicted of an offense *or who has been adjudged to have committed an act of juvenile delinquency.*" (18 U.S.C. § 4101(e), italics added.) " 'Sentence' means not only the penalty imposed but also the judgment of conviction in a criminal case or a judgment of acquittal in the same proceeding, *or the adjudication of delinquency in a juvenile delinquency proceeding* or dismissal of allegations of delinquency in the same proceedings." (18 U.S.C. § 4101(h), italics supplied.) The statute also permits nonresident juvenile offenders to participate in international prisoner transfers where the finding of juvenile delinquency is based on noncriminal conduct. "Juvenile delinquency" is defined as: "(1) a violation of the laws of the United States or a State thereof or of a foreign country committed by a juvenile which would have been a crime if committed by an adult; or

"(2) noncriminal acts committed by a juvenile for which supervision or treatment by juvenile authorities of the United States, a State thereof, or of

---

[2] In contrast, United States prisoner exchange treaties with Canada and Bolivia expressly include juvenile offenders. (United States-Canada Treaty on the Execution of Penal Sentences (1978-1979) art. I, 30 U.S.T. 6263, 6266; United States-Bolivia Treaty on the Execution of Penal Sentences (1978-1979) art. VIII, 30 U.S.T. 796, 803.) We presume section 738 authorizes the transfer of juveniles under these treaties and 18 United States Code section 4100 et seq.

the foreign country concerned is authorized." (18 U.S.C. § 4101(d).) Thus it is apparent that 18 United States Code section 4100 et seq., enacted to implement the treaty with Mexico, contemplated other treaties in which juveniles would be included.

I also reject the Attorney General's contention that transfers under the Border Youth Project are merely procedures by which undocumented Mexican youth are reunited with their families and cannot be viewed as prisoner transfers. The federal statute defines prisoner transfers as a "transfer of an individual for the purpose of the execution in one country of a sentence imposed by the courts of another country." (18 U.S.C. § 4101(j).) Since juvenile dispositions are "sentences" within the meaning of 18 United States Code section 4101(h), a disposition which includes assignment to the Border Youth Project for return to Mexico is a prisoner transfer.

The Attorney General concedes the purpose of the Border Youth Project is "to facilitate an appropriate disposition of undocumented alien-minor offenders."

"Such dispositions include reuniting the alien minor with his or her family thereby facilitating the minor's rehabilitation in his or her country and culture; or providing for appropriate institutionalization of more serious offenders and recidivists again in his or her own native country and culture." (*Ibid.*) Many of the juveniles transferred under the Border Youth Project are placed on probation by the Tijuana juvenile court and this continued supervision by Mexican authorities must be viewed as the execution of the juvenile disposition imposed under California law. Manuel was transferred as a juvenile offender with the recommendation he receive "second level treatment" in Mexico.[3] He was detained in the Tijuana juvenile facility before being reunited with his family.

The treaty with Mexico for the transfer of adult prisoners states:

"Nothing in the Treaty shall be interpreted to limit the ability which the Parties may have, independent of the present Treaty, to grant or accept the transfer of youthful or other offenders." (United States-Mexico Treaty on the Execution of Penal Sentences, *supra,* art. VIII, 28 U.S.T. at p. 7407.) The Los Angeles County Counsel, amicus curiae on behalf of the Los Angeles County Juvenile Court and Probation Department, argues without citation to legislative history that this clause "clearly envisioned" the Border Youth Project "without the necessity of a formal agreement." The

---

[3] Second-level treatment is a term used by Mexican officials to describe placement of juveniles at "La Granja," a state operated honor camp in Mexicali. First-level treatment involves probation at home.

amicus argument ignores the fact that only the sovereign states of Mexico and the United States were parties to the Treaty on the Execution of Penal Sentences. Thus any reference to transfers between the parties cannot have envisioned the informal arrangement between the County of San Diego and the government of Tijuana, Baja California, which is at issue in this appeal.

I therefore conclude that in the absence of a federal treaty authorizing the transfer of juvenile offenders between the United States and Mexico, the order directing that Manuel be delivered to the officials of the Tijuana juvenile court pursuant to the Border Youth Project is invalid. Should the United States and Mexico negotiate a treaty for the transfer of juvenile offenders in the future, 18 United States Code section 4100 et seq. would control the extent of state and local involvement in the actual transfers.[4]

### III

*Preemption and the Compact Clause*

The compact clause sets forth the second constitutional bar to states entering into international agreements.[5]

"No State shall, without the consent of Congress . . . enter into any agreement or compact with another State, or with a foreign power." (Art. I, § 10.) In *Holmes* v. *Jennison, supra,* 39 U.S. 540, the Supreme Court was evenly divided on the question of jurisdiction to review the Vermont Supreme Court's denial of Holmes's petition for a writ of habeas corpus. However, Chief Justice Taney and three others addressed the merits of Holmes's claim that Vermont's informal agreement to surrender him to Canadian authorities violated the compact clause. Chief Justice Taney read the compact clause broadly.

"When, therefore, the second clause declares that no State shall enter into 'any agreement or compact' with a foreign power without the assent of Congress, the words 'agreement' and 'compact' cannot be construed as synonymous with one another; and still less can either of them be held to mean the same thing with the word 'treaty' in the preceding clause, into which the States are positively and unconditionally forbidden to enter, and which even the consent of Congress could not authorize." (39 U.S. at p. 571 [10 L.Ed. at p. 594].) After briefly reviewing writings on the law of nations, Taney concluded that "[t]he word 'agreement' does not necessarily import

---

[4] 18 United States Code section 4102 empowers only the United States Attorney General and his or her designees to receive and transfer offenders on behalf of the United States.

[5] We premise our discussion of the compact clause on the assumption that a prohibition of state action in the international arena applies with even greater force to local action.

any direct and express stipulation; nor is it necessary that it should be in writing. If there is a verbal understanding to which both parties have assented, and upon which both are acting, it is an 'agreement.' " (*Id.* at p. 572 [10 L.Ed. at p. 595]; see also Rest.3d Foreign Relations, *supra,* § 301, com. b, p. 149.) He also concluded it was the intention of the framers of the Constitution to use the most comprehensive terms in order to cut off all connection and communication between states and foreign powers. ". . . [W]e shall fail to execute that evident intention, unless we give to the word 'agreement' its most extended signification, and so apply it as to prohibit every agreement, written or verbal, formal or informal, positive or implied, by the mutual understanding of the parties." (39 U.S. at p. 572.)

In 1893 the Supreme Court softened Chief Justice Taney's interpretation in *Virginia* v. *Tennessee* (1893) 148 U.S. 503 [37 L.Ed. 537, 13 S.Ct. 728]. The court held that Congress had impliedly consented to the 1803 boundary between the two states. It then discussed the compact clause in dictum, concluding that the framers of the Constitution could not have intended the prohibition to reach every agreement with another state or foreign power. The court reasoned that the compact clause was directed only to "the formation of any combination tending to the increase of political power in the states, which may encroach upon or interfere with the just supremacy of the United States." (*Id.* at p. 519 [37 L.Ed. at p. 543, 13 S.Ct. at p. 734]; accord *Northeast Bancorp* v. *Board of Governors, FRS* (1985) 472 U.S. 159, 175-176 [86 L.Ed.2d 112, 126, 105 S.Ct. 2545].)

In light of these principles, the question before me is twofold. First, does the Border Youth Project involve an "agreement" between the County of San Diego and Mexican juvenile authorities? If so, does that agreement "encroach upon or interfere with the just supremacy of the United States"?

Based on my review of the documents supplied by the Attorney General and amici curiae, I conclude the Border Youth Project was based on a verbal agreement between the San Diego County Probation Department and Board of Supervisors on one side and the Consul General of Mexico and the Tijuana juvenile court on the other. Pursuant to this agreement the board of supervisors, through VIP, paid a judge and a social worker from the Tijuana juvenile court to assist the department of probation in processing Spanish-speaking juveniles believed to be undocumented aliens. Specifically, staff from the Tijuana juvenile court help determine the name, age and nationality of these youth and attempt to locate their parents. Those selected for Tier Two[6] are prosecuted in the juvenile court system and returned to Mexico pursuant to a juvenile court dispositional order. The

---

[6] See discussion of Tier One and Tier Two procedures beginning at page 77, *ante.*

agreement benefits San Diego County by significantly reducing the cost of caring for undocumented alien youth. Mexico is benefitted by the opportunity to punish, counsel or reunite these youth with their families.

I have already outlined the manner in which the Border Youth Project encroaches on the supremacy of the federal government in foreign relations and prisoner exchange. In *Holmes* v. *Jennison, supra,* 39 U.S. 540, Chief Justice Taney distinguished between a state's exercise of the police power involving only internal concerns and acts which constitute an unconstitutional encroachment in an area preempted by the federal government. The distinction is instructive here. A state's power to enter into agreements with foreign nations for the surrender of prisoners "is . . . in no degree connected with their police powers; and they can, undoubtedly, remove from their territory every description of offenders who, in the judgment of the Legislature, are dangerous to the peace of the State. It may, indeed, be supposed that along the borderline which separates the Canadas from the United States, the facility of escape into another jurisdiction is a temptation to crime, and that an arrangement between the authorities of the province and the States which adjoin them, for the mutual delivery of offenders, would be advantageous to both. *If such an arrangement is deemed desirable, the foresight of the framers of the Constitution have provided the way for doing it,* without interfering with the powers of foreign intercourse committed to the general government, or endangering the peace of the Union. Under the [compact clause] any State, with the consent of Congress, may enter into such an agreement with the Canadian authorities." (*Id.* at p. 578 [10 L.Ed. at p. 598].) Applying this distinction to the Border Youth Project, the return of Tier One juveniles to Mexico without prosecution should be viewed as a valid exercise of California's police power. However, the agreement with Mexican juvenile authorities which permits the return of Tier Two undocumented alien youth to Mexico pursuant to a juvenile court dispositional order clearly violates the compact clause. If such an agreement is deemed desirable, the consent of Congress is essential.

IV

*Due Process*

The juvenile law has undergone dramatic changes in recent years. It is no longer a simple and informal system but an interesting mix of formal due process requirements and informal procedures developed in an effort to rehabilitate young people by dealing promptly and directly with problems during their formative years. The trade-offs which impact the traditional juvenile law system are the result of balancing the constitutional protections

to which children are entitled against the potential benefits of the earlier approach.

The government's power to punish, including the power to punish both juveniles and aliens, must be exercised in accordance with due process of law. (*Rosado* v. *Civiletti, supra,* 621 F.2d 1179, 1194; *Plyler* v. *Doe* (1982) 457 U.S. 202, 213 [72 L.Ed.2d 786, 797, 102 S.Ct. 2382]; *Shaughnessy* v. *Mezei* (1953) 345 U.S. 206, 212 [97 L.Ed. 956, 963, 72 S.Ct. 625, 629]; *Wong Wing* v. *United States* (1896) 163 U.S. 228, 238 [41 L.Ed. 140, 143, 16 S.Ct. 977, 983]; *In re Winship* (1970) 397 U.S. 358, 367 [25 L.Ed.2d 368, 377, 90 S.Ct. 1068]; *In re Gault* (1967) 387 U.S. 1, 30-31 [18 L.Ed.2d 527, 547-548, 87 S.Ct. 1428].) This due process protection extends to juvenile court hearings and the imposition of a "term of disposition" and other sanctions imposed by the juvenile court judge. (*In re Winship, supra,* 397 U.S. at p. 368 [25 L.Ed.2d at pp. 377-378]; *In re Gault, supra,* 387 U.S. at pp. 30-31 [18 L.Ed.2d at pp. 547-548].)

My review of this record and the procedures established by the Border Youth Project raises numerous due process concerns. The criteria used by the juvenile court in selecting Manuel and others for participation in the Border Youth Project are vague at best. Whether the selection process is uniformly applied is unknown.

More serious is the arrangement's lack of specificity. The juvenile court's actions are particularly egregious here because there was no federal treaty or legislation to permit Mexico to enforce the California dispositional order. Given the Mexican authorities' total discretion in deciding what type of rehabilitation is required in Mexico,[7] there is no guaranty that Manuel or any other participant in the Border Youth Project will receive the sentence ordered by the juvenile court.[8] If Manuel had been incarcerated in Mexico rather than reunited with his parents, the juvenile court would be powerless to effect his release after 240 days in custody. A juvenile has a liberty interest in not being punished beyond the time permitted under California law. The process used here does not protect that interest.

I am particularly concerned with the Border Youth Project's failure to provide for consent, effective appeal or postappeal rights including habeas

---

[7] At oral argument the deputy attorney general acknowledged that although the juvenile court in San Diego County issues the order which assigns the ward to the Border Youth Project, the Tijuana juvenile authorities have full discretion to modify that order. Documents furnished by the Mexican Consul and the presiding judge of the juvenile court confirm the deputy attorney general's understanding.

[8] I agree with counsel for Manuel that the lack of specificity creates an analytical paradox. Due process requires that the arrangement with Mexico specify the nature of treatment the juvenile is to receive upon transfer. However, such specificity would provide clear proof of violation of the constitutional prohibition against entering into treaties with foreign countries.

corpus relief. I have already described various provisions of 18 United States Code section 4100 et seq. which pertain to juvenile offenders. This legislation reflects congressional intent to implement prisoner exchange treaties in a manner consistent with constitutional requirements of due process. The implementing statute requires the offender's verified consent before transfer. (18 U.S.C. § 4100(b).) None was obtained or required under the Border Youth Project.

The federal statute also prohibits any transfer from the United States while an appeal is pending. (18 U.S.C. § 4100(c).) As noted earlier, Manuel was returned to Mexico only two days after he signed his notice of appeal. The juvenile court later terminated jurisdiction. Thus Manuel has been denied an effective remedy before the court which ordered his disposition. Although Manuel's appellate counsel has pursued his appeal with imagination and vigor before this court, no court in this country—either state or federal—can provide an effective remedy because none has the power to order Manuel's return to California for a new disposition.

At oral argument the deputy attorney general acknowledged that comity[9] was the only basis on which the Tijuana juvenile court would honor a California appellate court decision reversing a juvenile court judgment. His statement merely recognizes that a city in a foreign country need not give full faith and credit to a California appellate judgment. This fact underscores my concern. Surely due process mandates a procedure which permits meaningful review of juvenile court orders.

I believe due process requires that transfer be accomplished only after informed consent to the transfer after all rights of appeal have been exhausted. I therefore conclude the Border Youth Project as implemented in Manuel's case violated fundamental rights of due process—rights to which he was unquestionably entitled as a juvenile and alien. And where, as here, the juvenile court disposition involves not only removal from the jurisdiction, but also the loss of federal constitutional protections, it is invalid.

My discussion of the due process issues complements my earlier discussion of the unconstitutionality of the Border Youth Project and underscores the need for a treaty between the United States and Mexico for the transfer of juvenile offenders. The federal treaties and statute implementing the transfer of offenders to foreign countries cover the due process issues with which I am concerned. These due process concerns only highlight the

---

[9] Comity of nations is defined as the "recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens or of other persons who are under the protection of its laws." (Black's Law Dict. (5th ed. 1979) p. 242, col. 2.)

important and complex issues which must be negotiated at the federal level with a full understanding of the impact of prisoner transfer on individual constitutional rights and the relations between sovereign nations. Based upon the foregoing I would therefore reverse the order.

A petition for a rehearing was denied November 16, 1989. Wiener, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied February 21, 1990. Broussard, J., was of the opinion that the petition should be granted.