Filed 4/25/13  In re J.R. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>J.R.,<br><br>          Defendant and Appellant. | A133353<br><br>(San Francisco County<br> Super. Ct. No. JW116235) |

This is an appeal from the juvenile court's jurisdictional findings of July 7, 2011 and dispositional order of September 2, 2011.  Pursuant to these orders, the juvenile court found minor J.R. committed one felony count of aggravated assault with a deadly weapon resulting in great bodily injury, continued him as a ward, and placed him on probation under home supervision subject to serving 180 days in Juvenile Hall with 120 days of credit for time served.  The juvenile court thereafter granted minor's request for an order regarding eligibility for special immigrant juvenile status.  This order, among other things, included findings that it was contrary to minor's best interests to return to El Salvador and was in his best interests to remain in the United States.  Following entry of this order and during pendency of this appeal, minor, who had reached the age of majority, consented through counsel to voluntary departure from this country in lieu of deportation.  For reasons set forth below, we affirm the juvenile court's decisions.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On May 10, 2011, a juvenile wardship petition was filed pursuant to Welfare and Institutions Code section 602, alleging that minor committed attempted murder (count one) (Pen. Code, §187/664), and assault with a deadly weapon (count two) (Pen. Code, §245, subd. (a)(1)).[1] The petition further alleged with respect to count one that minor personally used a deadly weapon (§12022, subd. (b)), and with respect to both counts that he inflicted great bodily harm (§12022.7, subd. (a)).  A contested jurisdictional hearing was held July 7, 2011, at which the following evidence was presented.

### I.     The Prosecution's Case.

On May 6, 2011, a group of friends that included minor, P.R. (victim), Brian, Omar, Oscar and Aaron, were hanging out at the Aquatic Park "beach" which is not far from the Embarcadero in San Francisco.  On this day, the group was drinking alcohol and smoking marijuana, which the boys and young men typically did when together.  The victim consumed about 10 beers over about a six-hour period, and appeared to get along fine with minor.  Sometimes the victim and minor did not get along.  Although they had been hanging out together since about March 2011, minor had become annoyed with the victim because he often smoked minor's marijuana without paying for it and sometimes made disparaging remarks to minor, calling him names like "stupid" or "idiot."  Minor sometimes made similar remarks, but the two boys generally did not threaten or physically abuse one another prior to the day in question.[2]  The victim often used profanity and picked fights with his friends, particularly when drinking or smoking marijuana.  The others, however, would usually just ignore him.

In the late afternoon of May 6, 2011, the group left Aquatic Park and took the public bus to City College in the Mission District.  Once there, they smoked more of minor's marijuana before walking to a nearby café.  Minor told the victim to refrain from smoking so much of his marijuana and, about five minutes later, hit him on the back of

---

[1]     Unless otherwise stated herein, all statutory citations are to the Penal Code.

[2]     Omar testified minor and the victim had once before engaged in a physical alteration.

2

the shoulder with his skateboard with significant force. The victim called minor an "idiot" and asked why he hit him, but minor did not respond. According to Omar, minor appeared "kind of panicked."

Fifteen minutes later, the group returned to City College. Several of them, including minor, continued to smoke marijuana. They laughed because minor had hit the victim, who did nothing. About 20 minutes later, the victim, who afterwards described his intoxication level as being an "eight out of ten," threw his skateboard at minor in a fit of anger when minor was not looking. The skateboard hit minor in the head with considerable force ("6" out of "10"). Minor staggered and almost fell but did not scream or cry in pain. Rather, he approached the victim and took a fighting stance. The victim tried to hit minor again with the skateboard, but missed. He then put up his fists to defend himself, but minor was able to punch him three times. The victim swung a punch toward minor one time, before stepping back to defend himself against minor's blows. When doing so, the victim tripped and fell backwards with his back toward minor. Regaining a standing position, minor then kicked the victim in the buttocks from behind.[3]

At this point, minor struck the victim in the back about six more times before finally walking away. The victim could not breathe. He touched his back and realized he was bleeding. A short while later, the police arrived.

Around 7:20 p.m., San Francisco Police Officer Jose Mora arrived at City College and contacted the victim. Seconds later, someone identified minor, who was being escorted in his direction by several people, as "the guy who stabbed him." Minor had blood on his hands and clothes and a Swiss army knife in his pocket. Mora examined minor's body and found no sign of injury other than a cut on the palm of his left hand. San Francisco Police Officer Josey Russell also examined minor and confirmed his only apparent injury was a cut on his left hand.

Meanwhile, an ambulance arrived, and the victim was taken to the hospital, where he remained for four days. The victim was treated for six "deep" stab wounds to the back

---

[3] Oscar and his brother took away the skateboard.

3

and chest, one of which was of such great force that it fractured his thoracic vertebrae. Any of the stab wounds could have been lethal had it lacerated the lung lining. A tube was implanted into the victim's chest to evacuate blood. The victim's blood/alcohol level was 0.19.

Investigator Sylvia Johnson from the District Attorney's Office interviewed Oscar regarding the May 6 stabbing not long after it occurred. Oscar told her that, during "a pause" in fighting between minor and the victim, minor took a knife from his pocket and showed it to Oscar and his brother in his cupped hand. Oscar responded by warning minor to "[t]hink about what you are going to do."

## II.    The Defense Case.

Defense counsel presented a theory of self defense. In doing so, counsel relied on, among other things, certain eyewitness testimony from minor and his friends, including Oscar, Omar and Aaron.

Minor testified that, as a child in El Salvador, he saw his father shot. Although his father survived, he changed after the incident, becoming easily angered (particularly when drinking) and having difficulty speaking. Later, his father was killed in another shooting that occurred during a robbery of his father's store.

When minor was 11 years old, he contracted meningitis, spending months in the hospital, during much of which he was in a coma. Once released, minor had to relearn to walk, talk and move one side of his body. Minor continued to suffer from short term memory loss.

Later, minor was pressured to join a gang in El Salvador. One gang member even put a gun to his head, threatening to kill him unless he joined. Minor also witnessed a friend beaten by gang members. He and his mother fled to the United States to avoid gang violence, but he was separated from her during their trip across the border and she has not been seen since. Minor continued on to San Francisco, where he was reunited with his adult sister, with whom he lived for about 10 months until she made him leave due to his marijuana habit. Minor then moved into a youth shelter, during which time he

4

met the group involved in the May 6 incident, including the victim.  These boys and young men became his only friends.

At first, minor and the victim were friendly.  However, after about three months, the victim began to threaten to hurt or kill minor, especially when he was drinking.  Minor took these ten or more death threats from the victim personally and seriously even though the victim also made them to others.

In particular, on May 6, 2011, while drinking and smoking marijuana at Aquatic Park, the victim wanted to fight everyone, calming down only when his friends said they were going to tie him to a post.  Later, after the group went to a café near City College, the victim blew smoke in minor's face when minor told him to give minor the marijuana cigarette. Minor put his hand on the victim's face and pushed him.  He did not hit the victim with a skateboard.  When the victim yelled at him, minor dropped his skateboard and ran back to City College.

Once there, the victim hit minor in the back of the head with his skateboard when minor was not looking, almost knocking him down.  The victim fell down and minor kicked him. The victim, still holding the skateboard, told minor:  "Come over, come over, son of a bitch.  Let's fight."  The victim chased minor around a car, threatening to kill him, threw his skateboard at him, missing, before coming at him with clenched fists.  Minor ran away and told the victim to calm down, but the victim kept threatening him, approaching him rapidly from behind a car. The victim then tried to hit minor with his skateboard, but fell down, turning his back to minor. At that point, minor took out his knife and immediately stabbed the victim because he feared the victim was going to kill him.[4]  He continued to stab the victim six times because the victim was still trying to hit him with the skateboard.  He had not warned the victim he had a knife.[5]

---

[4]     The defense presented a video recording of the incident taken from a City College surveillance camera.  Minor identified certain frames where he said the victim could be seen chasing him, but the tape was of very poor quality.

[5]     Minor admitted the victim did not hit him again with the skateboard after the initial blow.

5

Minor's friends told him to discard the knife, but he refused because he still feared the victim would retaliate. Eventually, minor ran to the bathroom to wash his hands, as he had cut himself during the incident. When he did this, the knife fell into the sink, rinsing off the blood. Minor's friends, one of whom called 911, escorted him to a police officer who had just arrived. At this point, Oscar told him: "You should have thought about what you did first."

Oscar testified that, after minor and the victim initially exchanged blows and minor kicked the victim from behind, minor retreated as the victim chased him around a car. They continued to exchange blows, with the victim "kind of covering himself and turning his back to [minor]." Oscar saw minor hitting the victim in the back, but could not see anything in his hand. He denied telling Investigator Johnson that he saw minor with a knife during the May 6 incident. Once the fighting stopped, Oscar saw the victim was bleeding. Oscar recalled that minor and the victim had threatened each other in the past. A few days before the stabbing, minor showed Oscar a knife.

Omar confirmed that, after the victim had struck minor with the skateboard, fallen, and was kicked by minor, the victim began chasing minor around a car, threatening him, and trying unsuccessfully to hit him with his skateboard. Omar described the victim as very angry, and minor tried repeatedly to stop the fight and calm him down. The victim, however, continued to come at minor. Then, the victim swung the skateboard at minor, missed, and fell down, at which point minor began hitting him in the back. The victim released the skateboard and tried to protect himself. Eventually, minor took off running.

On cross-examination, Omar denied telling an investigator that minor threatened to "stick" the victim with a knife if he was attacked. Omar explained he heard from his companions that minor had made this threat. Minor and the victim both appeared upset and "serious" while fighting. Omar was not afraid of the victim even though the victim was often aggressive towards him and his companions.

Aaron confirmed the victim was often aggressive, particularly when drinking. Aaron simply ignored him, but minor, who was the youngest of the group and was often

6

the subject of the victim's aggressive "joking," was particularly bothered by it. Aaron had never seen the two in a physical alteration before the May 6 incident.

With respect to the May 6 incident, Aaron testified that minor is much bigger than the victim and "was pretty much winning the fight." At one point, minor was "on top" of the victim, who "wasn't doing anything" as he was being hit. Minor then backed up, as if thinking the fight was over, but the victim followed him, still holding the skateboard as if he was going to strike minor again. Minor walked away, but the victim chased him around the car, saying "[l]et's fight." Aaron then looked away and, when he turned back around, minor was hitting the victim in the back as the victim was crouched down. When minor stopped and walked away, the victim continued to follow him "like [he was] crazy." Aaron then noticed the victim was bleeding.

Another of minor's acquaintances, Jennifer, testified that she heard the victim challenge minor to a fight on May 6, but the minor declined, responding: "No, because I was scared and you have more street [knowledge] than what I have." The victim then "puffed up his chest" and laughed.

Finally, minor's adult sister testified and confirmed much of the information regarding minor's childhood in El Salvador and immigration to this country. She added that minor seemed depressed when he arrived in San Francisco and had been traumatized by the events of his childhood. Consistent with her testimony, Psychiatrist Laura Davies testified that her evaluation of minor confirmed he suffered from post traumatic stress disorder (PTSD) due to events surrounding his father's death and mother's disappearance. This disorder, as well as his cannabis abuse, caused minor to have nightmares and sleeping difficulties. Minor also tended to be highly irritable, impulsive and hypervigilant, and likely to startle easily and act out violently.

## III.    Rebuttal.

San Francisco Police Office Sanchez testified in rebuttal that Omar, when interviewed shortly after the incident, denied knowledge of what or who provoked the fight, claiming to have randomly come across the fight when riding his skateboard in the area. Officer Sanchez also testified that minor told him the victim approached him with

the skateboard and threatened to "give it to [him] hard." The victim then tried to hit minor, but the skateboard made contact with the wall first and only grazed his shoulder. The blow was not hard and did not hurt. Minor repeated this statement about being hit by the skateboard three times, and Officer Sanchez was fairly certain minor never stated that he believed he was going to be killed.

## IV. The Juvenile Court's Jurisdictional Findings and Disposition.

On July 7, 2011, following the contested jurisdictional hearing, the juvenile court sustained the allegation that minor committed assault with a deadly weapon and found true the enhancements that he personally used a deadly weapon and inflicted great bodily harm. The court found not true the allegation that minor committed attempted murder.

At the dispositional hearing on September 2, 2011, the juvenile court adjudged minor a ward of the court and placed him on probation in his sister's custody subject to the condition that he serve 180 days in juvenile hall with credit for 120 days served. This timely appeal followed.

## DISCUSSION

Minor raises the following issues for our review. First, minor contends the juvenile court erred in sustaining the assault count with enhancements for use of a deadly weapon and infliction of great bodily injury because the prosecution failed to prove beyond a reasonable doubt that he *did not* act in justifiable self defense. Second, minor contends in the alternative that, because the juvenile court's jurisdictional findings had as a possible consequence incarceration and deportation, he was entitled to a trial by jury. We address each contention in turn.[6]

## I. Does the evidence establish justifiable self defense as a matter of law?

Minor contends the juvenile court order sustaining the delinquency petition must be vacated because there is no substantial evidence supporting its finding that the prosecution negated beyond a reasonable doubt his theory of justifiable self defense.

---

[6] Minor has abandoned his third appellate claim that his case should be remanded because, in violation of the underlying principles of juvenile justice, he was moved to a county jail housing adult inmates.

8

Minor reasons the juvenile court relied on "a scintilla of hearsay evidence" negating his defense, while ignoring the wealth of evidence supporting it. Specifically, according to minor, this "scintilla of hearsay evidence" relied upon by the court was Investigator Johnson's testimony that Oscar told her when interviewed that, after minor pulled out his knife, Oscar urged him to think about what he was about to do. Moreover, minor argues, the weight of evidence supported his defense. This evidence included minor's testimony that he believed the victim was going to kill him based on prior threats and on his heightened susceptibility to head injuries stemming from his history of meningitis; as well as eyewitness testimony from his friends that, shortly before the fight, the victim threatened "he was going to get [minor] when he wasn't looking," that the victim "slammed him over the head with a skateboard" with enough force that it "nearly caused [minor] to lose consciousness," and that minor attempted to withdraw from the victim after being hit with the skateboard, yet the victim "nonetheless pursued him."[7]

Where, as here, an appellant raises a claim of insufficient evidence, the reviewing court must determine "whether ' "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) The evidence upon which the judgment relies must be "reasonable, credible, and of solid value." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Further, the reviewing court may not reweigh evidence or evaluate the credibility of the witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "We may not reverse a conviction for insufficiency of the evidence unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) This rule likewise applies in juvenile criminal matters. (E.g., *In re James B.* (2003) 109 Cal.App.4th 862, 872.)

---

[7] The juvenile court denied minor's motion for a directed verdict based on his self defense theory. In doing so, the court specifically found Investigator Johnson's testimony regarding Oscar's pretrial statement admissible and relevant to the issues of both Oscar's credibility and minor's intent insofar as Oscar's statement served as a "warning by somebody as to what to do about the knife."

The prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not act in self defense. (*People v. Lee* (2005) 131 Cal.App.4th 1413, 1429; *People v. Adrian* (1982) 135 Cal.App.3d 335, 341.)

Where, as here, the appellant contends his justifiable self defense theory was established as a matter of law, the evidence must show all of the following: (1) the defendant's honest and good faith belief that (2) great bodily injury is (3) about to be inflicted on him. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064.) The victim's prior acts of violence and reputation for violence, among other things, are relevant in meeting this standard. (*People v. Minifie, supra,* 13 Cal.4th at pp. 1064-1065, see also *People v. Pena* (1984) 151 Cal.App.3d 462, 476.) However, "any right of self defense is limited to the use of such force as is reasonable under the circumstances. [Citation.] The right of self defense did not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack." (*People v. Pinholster* (1992) 1 Cal.4th 865, 966, overruled in part on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459, 462.)

On the other hand, if there is evidence of any "circumstance which may be reasonably regarded as incompatible with the theory that the [crime] was justifiable, the trier of fact, from a consideration of all the evidence, is warranted in finding that the act amounted to an unlawful [act]." (*People v. Collins* (1961) 189 Cal.App.2d 575, 591.) In this case, we conclude there is substantial evidence which supports the juvenile court's finding that minor's assault on the victim was unlawful.

Specifically, we conclude that, construing the evidence in a light most favorable to affirming the juvenile court's findings, as the law requires, the evidence was sufficient to permit the trier of fact to reject minor's theory of justifiable self defense based upon the following. First, the prosecution's evidence proved beyond a reasonable doubt that minor stabbed the victim six times in the back *after* getting the better of him in a fight during which two males with a contentious history inflicted considerable blows to each other while under the influence of significant amounts of marijuana and alcohol. For example, the evidence proved minor was larger and stronger than the victim, and had gotten the

upper hand in the altercation after, among other things, his friends took away the victim's skateboard and the victim was crouched down with his back to minor. Indeed, several eyewitnesses testified that, at the time minor inflicted the six stab wounds, the victim had fallen to his knees with his back to minor and no longer possessed a skateboard or other protective instrument, much less a deadly weapon. Second, there was testimony from Investigator Johnson that, before trial, Oscar told her that during a "pause" in the altercation minor showed him the knife, to which he responded by warning minor: "Think about what you are about to do."[8] Finally, there was evidence in the form of medical records demonstrating that minor's blows with the knife were unusually forceful and that each was potentially lethal.

Thus, as this evidence collectively demonstrates, while minor may have had the right to defend himself against the victim's initial attack, which included the victim chasing minor and swinging a skateboard at him, minor's resort to deadly force with the knife was not, and did not appear to be at the time, necessary for minor's defense. While there may have been contrary evidence, it is not the role of this court to "interject ourselves into the fact finding role." (*People v. Clark* (1982) 130 Cal.App.3d 371, 381; see also *People v. Scott* (1978) 21 Cal.3d 284, 296 ["uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable"].) Rather, we must presume in support of the judgment the existence of every fact the fact finder could reasonably deduce from the evidence. (*People v. Clark, supra,* 130 Cal.App.3d at p. 381; see also *People v. Johnson* (1980) 26

---

[8]    We reject minor's argument that Oscar's warning to minor when he saw the knife to "[t]hink about what you are about to do" is irrelevant to his self defense claim because it "speaks to the question of premeditation and intent, not to the question of whether the Minor needed to stab [the victim] in order to protect himself." Rather, we agree with the juvenile court that Oscar's warning was in fact relevant to minor's state of mind at the time he used deadly force. Among other things, Oscar's warning proved that an eyewitness to all the relevant events surrounding the crime attempted to point out to minor that deadly force was not in fact a necessary response to the victim's provocation. Moreover, as the evidence set forth above demonstrates, even without Oscar's warning, there was substantial evidence to support the juvenile court's finding beyond a reasonable doubt that minor's use of deadly force at the time and place of the crime was not justified.

Cal.3d 557, 576.) "It is only when, in light of the record so viewed, it appears that no reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt that a reversal of the judgment is proper." (*People v. Clark, supra,* 130 Cal.App.3d at p. 381.) As such, the juvenile court's finding that minor committed the assault with a deadly weapon must stand.

## II.    Was minor deprived of due process?

Minor's final contention is that reversal is required because he was denied his constitutionally-guaranteed right to a jury trial of the criminal charges against him. Minor reasons that, although there is generally no right to a jury trial in juvenile court (*Alfredo A. v. Superior Court* (1994) 6 Cal.4th 1212, 1225), a sustained petition in his case carried the possibility of deportation, a punitive rather than rehabilitative consequence requiring an exception to this general rule. We disagree.

As the record reflects, following the juvenile court's disposition, minor, who had reached the age of majority, was temporarily confined in a county jail after being transferred to federal immigration officials for deportation to El Salvador.[9] Thereafter, on July 30, 2012, during the pendency of this appeal, minor consented through counsel to voluntary departure from this county in lieu of deportation. For reasons we shall explain, minor's voluntary consent to departure renders his constitutional challenge invalid.

In so concluding, we draw guidance from *In re Manuel P.* (1989) 215 Cal.App.3d 48. There, our colleagues in the Fourth Appellate District, Division One, were asked to consider the disposition of a juvenile matter involving an illegal alien minor found to have violated terms of probation. Similar to our case, the minor in *Manuel P.* was released to federal immigration officials and then delivered to Mexican officials after waiving a formal deportation hearing.[10] (*In re Manuel P.*, *supra*, 215 Cal.App.3d at

---

[9]     Minor's second motion to augment the record, filed June 22, 2012, is granted.

[10]     The *Manuel P.* defendant was placed on probation, deported and ordered not to return to this country illegally after committing a crime in California. He then violated the terms of his probation by returning illegally and committed another crime. (*In re Manuel P.*, *supra*, 215 Cal.App.3d at p. 53.)

12

pp. 53-55 (cert. denied, *Manuel S.P. v. California* (1990) 498 U.S. 832.)  The appellate court thereafter rejected the minor's contention that several of his due process rights, including his right to appeal the juvenile disposition, were violated because he was, as a consequence of the juvenile court order, confined in a youth facility in Mexico "outside the protection of the Constitution."  The appellate court did so on the ground that the minor "waived all procedures by which he could have sought to remain in this country," including his right to request a formal deportation hearing or to pursue state processes designed to stay his return to his home country pending review by the appellate court.  (*In re Manuel P.*, *supra*, 215 Cal.App.3d at pp. 72-73, 74, citing, e.g., § 800; Code Civ. Proc., § 918, subds. (a), (c); Code Civ. Proc., § 923.)  Thus, while the *Manuel P.* court "agree[d] with Manuel that he, and other minors ordered returned to juvenile authorities in [their home countries], must have available procedural avenues which effectively preserve their full appellate rights," in that case, "[t]he problem . . . is that Manuel at no time sought to avail himself of any of them. [¶] Since Manuel was represented by able trial counsel who was ordered to remain on this case until statutory time for application of appeal had passed, and the appeal here was filed prior to his leaving this country, we can only assume Manuel, with the assistance of counsel, concluded it was in his best interest to return home regardless of his pending appeal.  Under the circumstances presented here Manuel has not been deprived of due process."  (*In re Manuel P.*, *supra*, 215 Cal.App.3d at p. 53.)

We conclude this reasoning applies squarely to the facts at hand, convincing us that minor, like Manuel, has not been deprived of due process during these juvenile proceedings.  Like Manuel, minor was represented by able counsel who we presume was aware of the available procedural avenues for minor to challenge his return to El Salvador, the most obvious of which was the opportunity he had to participate in formal deportation proceedings in federal court.  Nonetheless, minor, through counsel, voluntarily returned home rather than challenging deportation, despite the pendency of this appeal.  Under such circumstances, we conclude based on minor's voluntary decision

13

to waive all procedures by which he could have sought to remain in this country that he has received all the due process to which he was entitled.

## DISPOSITION

The juvenile court's judgment is affirmed.

_____
Jenkins, J.

We concur:


_____
McGuiness, P. J.


_____
Pollak, J.